Your Honors, may it please the Court, I, along with my co-counsel, Ms. Elliott, represent Petitioner Mr. Brown. This was not simply a case where the trial counsel failed to call a psychiatrist where they did call a psychologist and the psychologist's testimony would have been essentially the same as the psychiatrist. This is not simply a case where the defense failed to prove up its theory that there was a failure of supervision on the part of Oregon authorities. This is a case where there was a series of failures and mishaps both before and during the trial, the net effect of which was the complete failure and evisceration of Petitioner's mental health defense, and the mental health defense was the centerpiece of the mitigation case in the penalty phase of his trial. The state in rebuttal in the penalty phase called a psychiatrist, Dr. Brinkley. Dr. Brinkley testified that lithium would not have been appropriate for Petitioner, but he also testified that Petitioner did not have a mental condition for which lithium would be appropriate, essentially saying that Petitioner, Mr. Brown, was not mentally ill, and the defense  on the part of Oregon authorities. Who said he was mentally ill? Did Dr. Brinkley say he wasn't mentally ill? That's my understanding of his testimony. I think that the record bears me out. He said that Mr. Brown did not have a condition for which lithium was appropriate, but the way that the testimony was cleverly worded, but it was worded in such a way that it implied the direct implication was that he wasn't mentally ill, that he didn't suffer from manic symptoms. He never contested any of Dr. Morrill's diagnoses, did he? Well, they, the defense never even knew what he was going to, the point is the defense never even knew what he was going to say before he got on the stand, and then when he said what he said, they were completely unprepared to cross-examine him, and they were in no position to present rebuttal testimony, which is one way in which they could. Well, they didn't say that either. They said they made a decision not to. They said actually the person who would have cross-examined him says he was prepared, but they made a decision not to do it. But the only preparation that they did, Judge Berzon, for Dr. Brinkley was they interviewed him for a few minutes on the day that he was scheduled to testify, and I don't see how any reasonable defense counsel in this kind of situation could be prepared to do anything. What should they have done in your view? They had a couple of weeks. They knew that Brinkley was going to be called. What? Not how long? Well, they could have interviewed him earlier. They could have done some background on him. They could have... Well, we don't know that they didn't do background. They said they were prepared to cross-examine him. And they could have been in a position to secure a rebuttal expert, and they did none of those things. I just don't think... Wait a minute. They did interview him, right? So it's not... They don't have to present expert reports, right? There's no requirement that the state... If you present an expert, there was no requirement of an expert report. Right. Right. So what else could they do other than interview him? Well, I just don't see how any... Did they say they were prepared? Well, a trial lawyer can be prepared, adequately prepared, to do a cross-examination of a witness on the basis of a brief interview on the day that the witness is scheduled to testify. Did Brinkley have any obligation to talk to them at all? No. But they... So he could have just not talked to them at all? Well, the State was under no obligation to call him, but the State... The defense knew several weeks before... But did the State have any... And I don't know the answer to this. Did the State have any obligation to present him for an interview with... Yes. Under Washington rules of procedure... Did they say they were surprised by his testimony? They said they were totally surprised by the testimony. They said they didn't expect the testimony. They had no idea before Dr. Brinkley got on the witness stand that he was going to testify in the manner that he testified. And they didn't even realize the impact of Dr. Brinkley's testimony until the final argument, when essentially the State argued that the failure to cross-examine Dr. Brinkley was tantamount to accepting that his testimony was true. Well, obviously, they must have known that was going to happen and it would always happen. Well, they said that they didn't. But they made a judgment, apparently, that... I guess this is the question. There was then later an evidentiary hearing and Dr. Brinkley testified at some length. Presumably that's what would have come out of cross-examination. Would that have been better? Well, they had several questions that they could have... several risk-free questions that they could have brought out in cross-examination. But what's the answer to my question? If the cross-examination had gone the way the evidentiary hearing went, would that have been preferable? If the cross-examination went the way that it went in the deposition, I agree, it would not necessarily have been preferable. But all they had to ask Dr. Brinkley was, did you interview Mr. Brown? Well, I couldn't tell what was going on with that. But my impression from something I read was that neither side wanted that question answered because they agreed not to ask it. And I think it's because, and you can tell me if I'm right, because Brown refused to see him. No, that's not true. Some place it does say that, or would have refused to see him. During the evidentiary hearing, I think that question was asked and it was said he would have refused to see him. Well, under Washington law, they could have compelled Brown to see him. So Brown didn't have the right to refuse to see him. And the record reflects that Dr. Brinkley, although he was offered the opportunity to interview Mr. Brown by the prosecutor, did not take advantage of that opportunity. If I may move on to another factually related subject matter, Mr. Clevin, one of the defense attorneys, made the representation to the jury an opening statement that the defense would prove that Mr. Brown should have been supervised and on monitored medication and taking lithium when he was released from prison in Oregon. Dr. Maiuro, the defense psychologist, testified to that. Dr. Maiuro, in his testimony either on direct or cross-examination, said that he was not qualified to prescribe lithium. The state then called a psychiatrist who was eminently qualified to talk about lithium. And then in closing statement, another one of the defense attorneys... But there's a difference between being able to prescribe lithium and being able to talk about the effects of lithium. Somebody could be a scientist that could be quite an expert in what lithium does without actually having the ability to write a prescription. They're just not the same thing. That's absolutely true. In fact, a lot of people who write prescriptions, when you go to your doctor who writes a prescription, he usually doesn't know much about why a particular drug works. I mean, he follows guidance that he gets from people who are a lot more expert than he is. I mean, obviously not every doctor can be an expert in everything. So I don't see what the connection is between those two. Well, that's absolutely true, Your Honor. I agree with what the Court just said, but the jury doesn't necessarily know that. Well, what did counsel say, defense counsel, about their own testimony during their closing argument about the lithium? Well, what I was going to say is it's the way that things played out in this trial... You know, it would be better if you answered questions. It would be better if you answered the questions. Judge Reinhardt asked you a question and you didn't answer it. Well, the defense counsel in closing argument said finally that whether Mr. Brown should have been on lithium or not, nobody knows. So essentially they were impeaching their own opening statement and contradicting what they said in their own opening statement, thus losing valuable credibility with the jury, and also they were conceding that their own expert was wrong, so that by doing that, they completely cut the legs out from under... Could you... I mean, the problem with this case is that these defense lawyers, unlike many that we see, actually did a lot of work. They put on a significant mitigation trial. They had all kinds of investigators looking at his childhood and everybody he ever knew. They certainly put on a case. They also put on a mental health case with a competent person and somebody that Dr. Brinkley said was a competent person. So the case is narrow to this one problem, and really it seems to me your task was to show why this one problem, it gives everything else that was put on, was of great significance and of overwhelming significance. And I guess what I'm having some problem with is what is... How would you articulate exactly why the lithium issue is so supervening? I mean, partly you read it as saying that there was no mental health problem, but I'm not sure that that's a fair reading at all. It's that there was no need for lithium. Well, the way that the lithium issue played out in this case is that by failing to call a qualified expert, the state was able to use that to undermine, completely undermine the credibility of the defense expert and to completely undermine the mental health defense. Well, the state in its brief argues that one of the reasons they did not call an expert was that, and I think this is the Tann brief at page 17, that if they had gotten their own expert, the government could have, the prosecution, and the expert came up with the wrong answer, the prosecution could have discovered that and it was a boomerang. Do you disagree with that? You remember the argument? No, I do remember the argument. They're relying on a state case by the name of Stavisas Pollock, T-A-W-L-Y-K. I understand the argument and I think that problem exists in every case. Well, what was the testimony that the defense lawyers gave as to why they didn't get a psychiatrist? They didn't get a psychiatrist because they didn't think about it in time. And then what happened after they tried to get Dr. Brinkley and belatedly they called him and then when he said no, he wasn't available, what did they do and what did they say about why they didn't do it? After they learned that Dr. Brinkley wasn't available, they did nothing and what they said in the evidentiary hearing is that they had no idea why they didn't do anything further. Is there any testimony to support the state's speculation that there was some conscious reason that they didn't do it? The evidence overwhelmingly showed that it was not a tactical decision. They admitted in the evidentiary hearing that it wasn't a tactical decision. Well, but it's quite common for defense lawyers to fall on their sword that habeas, I mean, this is a well-known tactic, you know, you fall on your sword and then, you know, to help your client. But my question is, was this a real risk that whether they had the subjective view or they didn't have the subjective view of something that's of interest but not particularly that's positive, my question is, is the state correct when it argues that had they gone with psychiatrists and had the psychiatrists given the wrong diagnosis, the state could have then have used that, could have had access to this information and used it. Are they right about this or are they wrong about this? Under Washington law, Mr. Sampson is correct that if they had gone to a psychiatrist... But that's not the answer to the question. The answer is, is it possible that that's the reason they didn't go to a psychiatrist? And the answer is they did go to a psychiatrist and they couldn't get him. So obviously that's not the reason. They did try to get a psychiatrist. They just did it late and incompetently. If they had been trying to avoid getting a psychiatrist, they wouldn't have gone to one. Isn't that the answer? The evidence is that they didn't make any attempt to get a psychiatrist. To get a second psychiatrist. They did try to get a psychiatrist. Once they learned that Dr. Brinkley was... No, well, no. They went to Dr. Brinkley, who's a psychiatrist, right? Right. So they did try to get a psychiatrist. They did. So the reason they didn't have one couldn't be because they were trying to avoid getting a psychiatrist. That's correct. Okay. But I didn't want to... What exactly did they do with Dr. Brinkley? They asked Dr. Brinkley if he was available. Dr. Brinkley told them that he'd already been hired by the state. And that was... That's quite different from actually trying to retain him. I mean, an inquiry whether somebody's available is not quite the same as saying, here, we want to hire you. Counsel can always ask whether somebody's available without actually committing to using that person, right? That's different. I would like to answer the Court's question, though. That risk that you're going to get an unfavorable opinion, Your Honor, exists in every criminal case. Here, the objective indicators and the medical history, particularly the history from Oregon, showed pretty clearly that the man did have a problem with manic depression. I'm sorry. What was the show there? The medical records from Oregon Prison. I mean, the two therapists... What you have is a prison counselor who managed to persuade a doctor, after some effort, to prescribe him lithium. He went through a trial that was supposed to last 30 days, but he actually didn't go through the full 30-day period. And we have no evidence at all as to whether it made any difference. But she... As best we... I mean, the best the record shows, right? She testified at the evidentiary hearing in District Court, Your Honor, and she had... She's qualified under Oregon, under her license, her counselor's license in Oregon, to make medical diagnoses. She had lots of on-the-job training. Well, wait a minute. One thing is that certainly if Dr. Mayaro wasn't going to stand up, she was going to stand up worse, because she was not a Ph.D. in psychology. She wasn't a professor at the University of Washington. Whatever was wrong with his testimony wouldn't be wrong with hers in spades. Well, the point I was... That's... She certainly was not going to be a good stand-alone mental health expert, and I'm not suggesting that, Your Honor. What I'm trying to say is that with what she had put in the chart, there was every reason to believe that there was a good likelihood that a psychiatrist would render a favorable opinion. What is it that she put in the chart? That he was bipolar. Did she put in the chart that he was manic and bipolar and under those circumstances... Well, you say he was bipolar like you would say he's 5'7". Bipolar is a diagnosis, and other than her view that he is bipolar, is there anything in the record that he is bipolar or unipolar or that he has had a long history of diagnosis of being manic-depressive or that he has been treated with lithium other than for the 30 days that she managed to persuade some doctor to prescribe it to him? Is there anything like that in the file? I don't know that... I could say, Your Honor, that there was a conclusive diagnosis in the chart, but there was certainly... Did you hear my question? I think maybe I mis... I did hear it. I don't know if I understood. Is there anything in the file other than the fact that this one woman, who is not a doctor, thought that he was bipolar? Is there anything else in the chart supporting that diagnosis? There was a second prison therapist in Oregon in the same chart with... who came to a similar conclusion, Mr. Moe, describing some of the behaviors that are... I don't remember any discussion of this. What did Mr. Moe say? I don't... I can't quote exactly, but I... Well, I mean, you're relying on it. Tell me what you're relying on. What do you think he said? Did he say this guy is bipolar? My recollection of the chart, Your Honor, is that he described grandiosity and pressure speech, which are symptoms... Well, but grandiosity and pressure speech is quite different from bipolar. You can have grandiosity and pressure speech as a result of any number of other psychoses. Bipolar is really quite a specific diagnosis. It's really called manic depressive. And you can be bipolar without having pressure speech, and you can have bipolar without being grandiose. My recollection, Your Honor, is that there was sufficient information in the chart to put the defense attorneys on notice that they needed to investigate further. And they did, and they put on a very... I mean, they put on Dr. Mayoral, who went through a very specific and lengthy, and much more lengthy and specific than Dr. Brinkley, explication of the tests he gave and the interviews he did and the DSM criteria and why he came to the conclusion that he did, and it reads pretty well anyway. And he seems like an impressive guy. And my reading was that Dr. Brinkley may have touched him on the lithium stuff, but didn't really on the question of whether this guy had a mental health problem, a serious mental health problem. And who was it that told the defense lawyers that Dr. Mayoral's testimony would not be enough and that he needed a psychiatrist? Dr. Mayoral. And how many months was he under lithium? Was it 30 days? I thought it was six months. Dr. Brinkley, I think when Sally — my recollection of the medical record was that at the longer period, that Sally — It was from at least October to March, wasn't it? Right, yes. It was at least 30 days. It was a lot more than that. It wasn't 30 days, October to March. I'm sorry. My recollection of the evidentiary hearing, Your Honor, is that Sally Schick testified that it was a shorter period. Yes, but she was wrong because the records — I mean, that's one other thing about her. She was plainly wrong because the records, as Judge Reinhart says, definitely show that it was October to at least February. I don't know about March. So she was just wrong. It's a good thing they didn't put her on, eh? But in any event, it was Dr. Maiaro who said that his testimony would not be sufficient and that they would need a psychiatrist. That's correct, Your Honor. And going back to Judge Bersin's point — Is he also a cost-examination expert? No. Does he have a J.D. in addition to his Ph.D.? No, Your Honor. So when he says, oh, I don't think — I think you need a psychiatrist — Does he know the difference between a psychiatrist and whatever this — what is it? He's a psychologist. Yeah, between a psychologist and a psychiatrist. Does he know that, do you think? He knows that. And he told them that he was not qualified to discuss lithium. He said he wasn't qualified to prescribe it. He certainly didn't say he was not qualified to discuss it. When he told them he was not enough, that you needed a psychiatrist, do we know what he told them? Why he told them he wasn't qualified? Because he's not qualified to prescribe. Is that what he told the lawyers? I'm not talking about his testimony. I'm talking about when he talked to the lawyers and said you need a psychiatrist. Why did he tell them — did he — do we know what he told them as to why they needed a psychiatrist? Or just that that was his conclusion? I presume. Don't presume. Okay. But, I mean, I don't have the exact conversation. Okay. I think they knew that he didn't have the expertise to talk about that. I mean, if he said — Explain to me exactly — I mean, because exactly why the lithium issue is more important than the diagnosis of Dr. Mayura. Is the lithium — I guess that's what I want to know. Is the lithium relevant only as it pertains to the diagnosis, or does it have independent significance? Because there was a second sort of mitigation theme that Oregon created this problem by not taking care of this person. I can't quite tell which — you know, what the lithium is exactly about. The lithium issue, standing alone, went to the question of whether or not he was supervised adequately when he was released on parole by Oregon. But the way that the lithium issue played out in terms of the trial testimony and in terms of the argument of counsel, the State was successfully able to use the lithium issue to undermine the mental illness diagnosis. That's kind of the whole point of what I'm trying to say. So you're more concerned about the mental health diagnosis, not any independent relevance of the lithium. Correct. Correct. One other question. Dr. Brinkley was — I mean, it was kind of bizarre, but he was testifying just for — he was basically reading into the record the records from Oregon. And that's really what he was doing mainly. And he was then saying that based on those records, he didn't see how the — why the lithium was justified. And one of the things he referred to was that Sally Schick at the very end, when he was leaving, checked off that there had been no improvement. And she did, in fact, say that. So what else — why wasn't that sort of hard evidence? First of all, did the jury get those records? I don't know. I don't know either. But why wasn't that, aside from whatever he said, in those records, she did, when the guy was leaving the prison, check out something that said there had been no improvement. So why wasn't that evidence that the lithium didn't do anything without regard to what he said? Well, if that's what the record said, that would be a basis for his testimony. But it seems to me, going back, Your Honor, if I'm answering the question correctly, to the importance of Sally Schick, she could have been called as a witness to say that she saw an improvement. Yeah, but she would have been cross-examined with her little checkmark. I don't know what the significance of that is, but it is sitting there. Well, the Court has her testimony and can judge the effect of her testimony from the record in the evidentiary hearing. And going back to Dr. Brinkley, it's true that all he was doing was testifying on the basis of what he saw on the medical record. But the way that his testimony was phrased and the way that his testimony was argued at the conclusion of the case was that it was that he did not see that Mr. Brown had bipolar or a mental condition, which would have been a mitigator. And that's the way the argument was left. You have three minutes left. Do you want to say that? Pardon me? You have three minutes left. Yeah, I do. Thank you very much. Okay. We'll hear from the State. May it please the Court, I'm John Sampson, Assistant Attorney General representing the Respondent Appellee. In this case, the issue is not whether Mr. Brown has a particular disorder or whether a counsel should or should not have called certain experts. The primary issue is whether the State court adjudication was a reasonable application of Supreme Court precedent. And in this case, it was. The State court reasonably determined that Mr. Brown had not shown both deficient representation and prejudice. In responding to some of the questions that were asked of Mr. Levy, the one question was, what did Mr. or Dr. Levy say? With the State court on the question of adequacy of representation, are we allowed to go back and re-weigh prejudice? Or do we then have to grant relief? No, Your Honor. In fact, the Court has to look at the State court's analysis of the prejudice issue. What do you make of Rompilla? I'm sorry, Your Honor? What do you make of Rompilla? In Rompilla, it is a different case than this because Well, that's always true. Otherwise, it wouldn't be. Justice O'Connor's opinion, the concurring opinion, she was the fifth vote, is very telling in that case because in Rompilla, she said that if counsel's failure to obtain the necessary mitigating evidence had resulted from the lawyer's careful judgment about how to marshal their time and serve their client, that would not have been an ineffective assistance to counsel. That's right. So she goes off, and she is a swing vote, and she adds something on the question of whether it's ineffective. But she doesn't take issue with Justice Souter's majority opinion insofar as it says, well, here's all the mitigating evidence they would have found, and he doesn't then go back and re-weigh, and it's almost like he overrules Wiggins. I mean, that's exactly what Wiggins said you shouldn't do, which is to look only at the mitigating evidence, doesn't re-weigh the aggravating evidence, and says, oh, yes, of course it's prejudice. So I'm just wondering, after Rompilla, if we get to that point, and maybe this is not the point of your analysis where you want to be talking about it, about prejudice, but assuming that we disagree with you on the first part of the analysis and say there was deficient performance. Assuming that and assuming that the court were to find that the state court adjudication of the prejudice was objectively unreasonable, Rompilla is different. If we disagree with the state court on effective representation, then we can't be bound as to the they would have engaged in a different way, and the question is can we then go back and re-weigh? Do we go back and re-weigh, or do we simply say, well, once we find there's deficient performance, that's the end of the matter? Your Honor, you have to, the court has to consider both prongs of Strickland and look at the state court's adjudication. Is that what Justice Souter did in Rompilla? Is that what he did? I believe, if I remember correctly from the case. It is Souter, isn't it? Did the state court ever reach a prejudice issue here? Yes, Your Honor. The court did. The court specifically said in 143, Washington II, at pages 450 to 51, the court said a Petitioner cannot under this claim establish either deficient performance by his counsel or resulting prejudice. And the court then in several paragraphs talked about both the reasonable representation and the fact that calling it additional witnesses would not have affected the verdict. They may not have used the most precise terms throughout the entire paragraph, but they did address both prongs. In fact, the district court concluded that they had not addressed prejudice. The district court, I would say, erred in that point. And since this Court's review is de novo, the Court can look past that ruling of the district court. The Rompilla case, though, there was not really a dispute as to whether the evidence would have the additional mitigating evidence would have affected the jury's verdict. And it's my reading of Rompilla that prejudice really wasn't an issue. The focus of the court in that case was on the first prong of Strickland. This case is different than Rompilla because in this case, unlike that case, there was extensive social history and mitigation evidence regarding Mr. Brown's mental illness that was presented to the jury. So the cases are factually different. There was a question regarding whether Dr. Maiaro was competent and qualified to even render an opinion. And there is a State court finding, the State Supreme Court found, that he was a qualified expert. They found that at, in that, in what I just quoted at pages 450 to 51 of the opinion. And what Dr. Maiaro actually told counsel, and this is at his excerpt to record 1883, he said this in the evidentiary hearing, that in the process of conducting his evaluation, he felt there was an issue related to inadequate management of the psychiatric disorder and the issues regarding the administration of the psychotropic medication. And he referred them to a psychiatrist so that they could get an additional expert opinion regarding the prescription of the medication. Dr. Maiaro was qualified to diagnose, as clinical psychologists are, they're qualified to diagnose whether or not a patient has a particular mental disorder, and he's qualified to recommend lithium treatment, which is what he testified he would have done in this case. There was also a question about whether or not counsel simply failed to get a psychiatrist. And actually there is evidence in the record, and there's a district court finding the fact, excerpt to record 2469, where the district court found that counsel discussed the benefit of a psychological versus psychiatric evaluation. This was when Dr. Cripe, who was a neuropsychologist, found no organic brain disorder and recommended specifically that counsel get a psychological evaluation by a clinical psychologist. Counsel discussed the benefits of the psychological versus psychiatric opinion. They decided to go with the psychological opinion because it provides more information, because there's more psychological testing. There's a finding of fact by the counsel during the course of trial preparation as to why they did not get a psychiatrist. And then when Dr. Maiaro recommended a psychiatrist, they attempted to contact the one psychiatrist he recommended. They learned he was retained by the state. They discussed whether or not they should get another or attempt to get another psychiatrist, and they made a tactical decision that they would not. And is it where in the transcript does it say they made a tactical decision? Your Honor, it was in, there are a couple places, excerpt to record 1804-05, excerpt to record 19-07-08, and supplemental excerpt to record 271. Mr. Mulligan and Mr. Clevin had a dispute as to whether they should seek a continuance. Mr. Clevin, who was one of the co-counsel, thought they should seek a continuance. Mr. Mulligan said, no, I'm lead counsel. I don't want to seek a continuance necessary to get a psychiatrist. Yeah, but that was when, after, I mean, if they should have had a psychiatrist, they should have had it before Dr. Brinkley testified. And that whole discussion about having the deliberations over Christmas and not giving the prosecution more time to prepare and all that was only in the exigency of whether they should, after having heard Dr. Brinkley, get a psychiatrist. But that's really not the question, is it? It is, Your Honor, because Dr. Maioro's recommendation that they get a psychiatrist was made shortly before the start of trial. Okay. Not months before, but. Yeah, but my impression is that this discussion was all after Brinkley showed up, no? Your Honor, there was a discussion before that when Dr. Cripe, and this was several months before trial, Dr. Cripe recommended an evaluation by a clinical psychologist and they discussed, there's evidence by Mr. Shipp that there was a discussion amongst the defense team, should we get a psychologist? No, I understand that. But the second discussion, which was focused around continuances and so on, was at the point at which they had to make a decision whether to report about the rebuttal after it occurred. Yes, Your Honor. And that was made when Dr. Maioro, shortly before the start of trial, made that recommendation. So you actually have two discussions between counsel, should we get a psychiatrist or not. One early on, and they said, let's get a psychologist, and then one during the course of the trial when they said, let's not seek a continuance. So you actually had two discussions by counsel and two decisions which were, even if this Court were to think were incompetent, the State Court can determine were at least reasonably competent representation. What is your understanding of the significance of lithium? I mean, maybe I'm just being very thick about this, but it seems to me helpful to know exactly what the significance of the lithium issue was and was understood to be by the participants in the trial. Your Honor, the significance of lithium is lithium is used as a psychotropic medication to treat certain disorders, one of them being bipolar disorder. Right, but I presume somebody might have bipolar disorder but not be appropriate to be treated with lithium. That goes beyond my expertise, but I believe that could be true. Dr. Brinkley, the State's Did Dr. Brinkley ever testify that Brown didn't have bipolar disorder? Didn't have what, I'm sorry? Bipolar disorder. He said that he did not believe that Mr. Brown had a mood disorder. I know that. Did he ever say he didn't? When did he say he didn't think he had a mood disorder? He diagnosed Mr. Brown as having rather an antisocial personality disorder. But I think more at the trial, did he ever say that he didn't have a mood disorder or that he only had a, I thought that was more in the evidentiary hearing. That may have been, I may be mixing up the two records. I know that what he did testify at trial was based on his review of the records. Dr. Brinkley determined that he did not see anything in the records that showed Mr. Brown was appropriate for lithium treatment. And I believe that he gave the diagnosis that he was antisocial personality disorder and sexual sadism. But he did not have the kind of disorder that the defense counsel has been talking about. That was Dr. Brinkley's testimony. That's correct. But again, Mr. or Dr. Maiara was competent and qualified, and we have a state court finding of this, that he was qualified to give an opinion as to whether or not Mr. Brown had a bipolar disorder. So to say that they didn't have a competent expert to testify as to his disorder is factually inaccurate. Looking at this case, the court must look at it at the time of trial, at the time and prior to trial. And prior to trial and at the time of trial, counsel did not have an opinion from Dr. Scherer or any other retained psychiatrist saying, yes, Mr. Brown is bipolar. When they started this case two years before trial, they did the best they could. They went out, they recovered an extreme volume of records trying to see what disorders Mr. Brown might have had, and they developed testimony to show that he did have bipolar disorder. They made strategic decisions of what witnesses to first seek out, and it did take time for them to get these witnesses. It took six months to get funding to get the neuropsychologist, and then it took, after he recommended a clinical psychologist, it took five months to get that funding for a clinical psychologist. So looking at this case from the shoes of counsel at the time of trial and prior to trial, they were doing a reasonable job in investigating the case. If this is not a case where Dr. Scherer came to them prior to trial and said, in my opinion, Mr. Brown is bipolar, they didn't have that opinion. And it would have taken, and actually Mr. Brown has not shown that they could have gotten that opinion from her at the time of trial. It took her several months to give an opinion in Federal court. She was not available during the state post-conviction proceedings to give an opinion, and it's unlikely she would have been available at the time of trial to give an opinion, since it took her several months and the court would not have granted a continuance of that length of time. Even if they had shown that counsel was deficient, there is still a finding of prejudice that would need to be made, and because the state court did adjudicate the claim on the prejudice claim, or on the prejudice issue, this Court would have to find that that state court adjudication itself was unreasonable, and they have not shown prejudice. If Dr. Scherer had testified as she did in Federal court, she would have admitted. The state had the burden to show an absence of mitigation, right? Your Honor, they had to show that there was not sufficient mitigating reasons to myriad. And they had to show it by beyond reasonable doubt. Yes, Your Honor. So their defense's burden would have been simply to cast reasonable doubt on the state's case, right? That's correct, Your Honor. And you don't think that if we were to conclude that they should have put on a psychiatrist who would have said, you know, this guy definitely had bipolar disorder, somebody like Dr. Scherer eventually testified, you don't think that that would have cast, if it were not on the prejudice part of the analysis, wouldn't that have cast doubt on Dr. Brinkley? Brinkley, yes. Thank you. No, Your Honor, it would not. First of all, if Dr. Scherer had been called to trial, most likely she would have testified at the same time that Dr. Maiaro testified before Dr. Brinkley, because the way it works in Washington, the state puts on a very number of eyewitnesses. So Dr. Brinkley would not have testified until after Dr. Scherer. Dr. Brinkley in his testimony could have pointed out that he is an expert in psychopharmacology and Dr. Scherer is not, and that Dr. Scherer has consulted with him, in fact, in the proper use of medications. He could have pointed out other defects in her opinion, and her own testimony would have pointed out defects in her opinion. Her opinion was that if Mr. Brown had been treated with lithium, it may have made him less likely to commit these crimes. But she could not say how less likely he would have been. She would have admitted that bipolar does not cause a person to commit sexually violent crimes, rather sexual sadism and a social personality disorder is what causes a person to commit them. Well, it's really not a question of cause and effect, whether the problem caused you to commit the crime. It's a question for mitigation of whether you have a mental problem, which might cause the jury to say, you know, here's one of, you know, this guy had a terrible life, he has all these problems. One of the problems he's got, he's bipolar. The defense theory in this case, as shown by counsel's testimony in the evidentiary evidence, is that the defense theory in the evidentiary hearing was that they wanted to give the jury a reason why Mr. Brown committed these crimes, a reason objective to him that was not his own cause, external to him, that was the reason why he went out and committed this torture, this rape, and this murder. Well, that's one thing they could have been trying to do. But another thing they could have been trying to do was simply demonstrate that he was a very, you know, he had a horrible life and he had serious mental illness and this is not the sort of person you want to execute. And they did that, Your Honor. They called his family. But mental illness would have been part of that. I'm sorry, Your Honor? The mental illness would have been part of it. That's why I keep asking for the difference between the mental illness issue and the lithium issue. Oh, and there's no – the State agreed that Mr. Brown was mentally ill. They agreed he had antisocial personality disorder, which is a mental illness. That's not a very attractive one. It is not. The other kinds of disorders that the defense is talking about are somewhat more appealing to the jury than to say somebody is a sexual sadist. It is more appealing if it could be shown that that's what caused Mr. Brown to commit this crime. No, no, even if it didn't cause him. I mean, when you're – you know, the case law from the Supreme Court says it's not important or necessary that when you prove a mental problem that you show that it's the cause of the crime. It's part of the mitigation when you're trying to paint a picture of a person. And that includes, you know, my mommy wasn't nice to me when I was a boy. Having a bipolar disease or some other kind of mental disorder is part of the picture. In addition to that, they were trying to show, I gather, that he had been on lithium and then he was off lithium and he didn't take it. And that was part of his problem. And they were able to show that, Your Honor. They were able to present testimony that he was on lithium and that he didn't have lithium. And they argued that the Oregon prison system let him down because they did not properly treat whatever his medical condition was. But that only matters if he did have a disorder that requires lithium. If you were just taking lithium because you liked it and you stopped doing it. But they did present that evidence. The question is whether the additional evidence by Dr. Shurer. Qualified psychiatrist. And somebody who would, as you said, your witness was somebody who was an expert in pharmacology and in these things. And they didn't present somebody who was as good. Who was specific to prescription of lithium. They did present a qualified expert. And an expert that the record shows is probably the best qualified psychologist to testify because he's an expert not only in psychological disorders, but actually in psychological disorders that lead to violent crimes. And also, Dr. Shurer's testimony would not have been as strong as Mr. Brown claims, because if she had testified at the time of trial, she did not have all the blood tests that were later developed in the Washington prison system following this conviction that she relied on in making her diagnosis. She admitted in cross-examination that those tests are necessary to determine whether lithium is appropriate. And if she had testified in 1993, she did not have those tests. So why couldn't they have been taken if they had hired qualified people? Couldn't the tests have been taken in 1993? Well, she testified that she did not have those tests. I thought the tests had to do with while he was in lithium. The tests have to do with showing whether there are a couple points, whether lithium is in a system, whether it's an appropriate amount of lithium that is in a system. And there's also tests, I believe Dr. Brinkley indicated, that show whether the thyroid is functioning properly, which is true. But none of those are terribly relevant to the issue. What seems to be, what wasn't available, I suppose, was that, I gather, after he got into the Washington state prison system, they did put him on lithium. So that's some corroboration that lithium was appropriate. And that wasn't available earlier. That was not available at the time of trial. And I submit that the Court should not consider that evidence, since it was not available at the time counsel was trying this case. And it would be looking at this case in hindsight based on new evidence. In addition, Dr. Scher would have admitted that Mr. Brown knew what he was doing. He intended to do his acts. He knew right from wrong. And he could control his behavior. She admitted in cross-examination that if a police officer had been in the car with Holly Washa, he would have not have chosen her. So, again, the weight of this evidence, sure, it would have been additional evidence. But was it so significant that there's a reasonable probability the jury would not have said so? Aren't all these cases, don't they all involve people who know the difference between right and wrong? Otherwise, they would be acquitted. That is true, Your Honor. But the fact is the jury could have, if she had testified, if Dr. Scher had testified, the jury would have heard this on cross-examination. And the weight of her testimony was not such that there would be a reasonable probability that the jury hearing this evidence would have decided not to sentence him to death. It would have still, based on the facts of this crime, which the jury was supposed to consider, based on all the evidence that was presented, including Dr. Maiaro's testimony, this additional evidence would not have affected the jury's verdict, and the State court decision on that was reasonable. In addition, of course, the claim is that the failure to cross-examine Dr. Brinkley would have affected the jury's decision. The prosecution argued, well, they accept Dr. Brinkley's testimony. They didn't even bother to cross-examine him. Your Honor, again, counsel made a reasonable decision not to cross-examine. There was a dispute between Mr. Kloven and Mr. Mulligan and Ms. Hupp. They talked about it. Mr. Mulligan is the judge. Yeah, I couldn't tell what that was all about from reading the record. He was going to ask him whether it was correct that he had never even seen the defendant, and then the prosecution wanted to ask another question, and they said, well, okay, if nobody asks any more questions, that's fine. What was that about? I guess we can't tell. One of the points that Mr. Kloven would have cross-examined Dr. Brinkley on was the lack of a personal interview with Mr. Brown, and the prosecution at the end of their And Mr. Mulligan said, well, if you don't ask that question, we won't ask that question. And why would they possibly do that? It's really mysterious. Why would the prosecution, why would the defense not want to make the obvious point that most people would think that a psychiatrist who hasn't met the subject doesn't have much to say about him? Why would they not want to ask that question? Well, Mr. Kloven had intended to ask that question on cross. But apparently he decided he, for some reason, made a deal with Mr. Matthews not to ask the question. He must have thought there was some advantage to the defense not to have the question asked. And that's Mr. Mulligan who made that decision. He's the lead counsel. Because he had decided at that point that they weren't going to have a cross-examination. So don't ask that. At that point? I thought it was after that. I'm sorry. Wasn't the concern that if they asked that question, it would come out that the reason that Dr. Brinkley didn't examine the defendant was that the defendant wouldn't allow it? That was one of the points. Was that true or wasn't it true? I mean, we've been told now that he didn't have the option not to allow it. So is that what — somewhere in the record there was a suggestion that he wouldn't allow it. And I'm not sure where that is. But is that true? Is it possible that he could have not allowed it? Your Honor, there's two places in the record that I've found just here in the court. Supplemental excerpts record 202 to 204 and excerpts record 1913 where there is the defense was opposing an interview and would have opposed an interview. And, in fact, were able to have Dr. Brinkley excluded from the courtroom during the course of the trial so that he could not observe Mr. Brown even from afar. Well, that's a different question. That's the Whitaker Chambers case, I think. It's different from having an examination than having a doctor testify on the basis of what he observes in a courtroom. But is it correct that you can't refuse under Washington law that the prosecution has a right to have the doctor examine him? Your Honor, the prosecution does have the right under Rule 35 of the state court rules to seek an examination, but defense counsel did say they would have opposed that examination. There was also a strategic decision made, and the court granted it to prevent disclosure of the expert's testimony and thus to prevent any evaluations prior to the guilt phase concluding. So there was a strategic – the evidence shows that the defense was doing all they could to limit the prosecution's access to any of the defense mitigation evidence, which would have included an interview of Mr. Brown. But also there was testimony by Dr. Brinkley in his deposition that if he had been asked that question, he would have said I really don't need an evaluation because of Mr. Brown's lack of veracity. A personal evaluation really wouldn't have done much. In fact, that seems like a not very credible story, though. I mean, a psychiatrist – I mean, most people would think that a psychiatrist would get something out of meeting a person, even if the person lied to them. Well, and Dr. Shurer did get something out of Mr. Brown. Mr. Brown, while treated with lithium, said that what he did was a game. And he viewed what he did to – Well, I know. And my comment was simply that Dr. – that at least – that Shurer was unlikely to regard Dr. Brinkley's – that explanation of Dr. Brinkley's for not having an interview as very convincing. Sure. But Dr. Brinkley's testimony has – was been and has been that he didn't see much use of an – of a personal interview with Mr. Brown because any information he received really wouldn't be that helpful because it wouldn't be truthful. But that's assuming that what a psychiatrist gets out of an interview is information, as opposed to an observation of the person. A – if you interview a schizophrenic person, you're not looking for information. You're looking to see – for observations that might tell you they're schizophrenic. Depending on what the mood disorder or what the mental disorder is, that's correct, Your Honor. But I think what you're asking really is what a psychologist does. A psychologist conducts the in-depth evaluation. A psychiatrist is really more of their – Dr. Shurer's evaluation was an hour to an hour and a half. It wasn't really that in-depth. I thought she said she spent 100 hours on it. A hundred hours on the case. Her interview with Mr. Brown, I believe, was an hour to an hour and a half, and that most of her time was looking at – through all the records and everything that was developed. The other thing is that Dr. Brinkley was actually a psychopharmacologist primarily, right? So his opinion on the diagnosis as opposed to the treatment may have been less competent than Dr. Mayero's, actually. That is possible, Your Honor. And, again, because experts – everyone recognized that experts disagree. Psychiatrists and psychologists disagree. Again, the weight of additional testimony would not have been enough to affect the outcome. Thank you. Thank you, Your Honor. You have about three minutes for rebuttal. Thank you. Well, it may be that Dr. Mayero's opinion on the diagnosis would have been less competent than Dr. Brinkley, but the jury didn't necessarily see it that way. More competent. It didn't play out this way in terms of the trial. Well, apparently if they had interviewed Dr. Brinkley, if they had cross-examined Dr. Brinkley, and asked him what he thought of Dr. Mayero's – I said, Dr. Mayero, apparently he's extremely high on Dr. Mayero. He would have said he was a very competent guy and so on. That's what he said in his evidentiary hearing. If they had cross-examined him, but they didn't. And the way it played out in terms of this trial is that the State was effectively able to use Dr. Mayero's lack of qualifications on the lithium to suggest to the jury that he wasn't competent to talk about the underlying diagnosis. And that's the way it all came together. And the cumulative effect of the deficiencies in closing argument was that the State was effectively able to suggest to the jury, as the jury reasonably would have understood the closing argument, that Mr. Brown was not mentally ill, which was the centerpiece of the defense. And that's the way that Mr. Brown suffered the prejudice from his counsel's failures. I'd like to just briefly talk about the unreasonable application issue, if I may. The Washington Supreme Court never considered any of this, never considered the effect of the ineffective assistance on Mr. Brown's defense. What the Washington Supreme Court simply did is say, well, Dr. Mayero said the same thing that a psychiatrist would have said, without ever considering or discussing how the lithium issue played itself out in terms of the presentation in this case. We believe that the Washington Supreme Court decision was an unreasonable application of federal law because it failed to consider critical facts as those facts bore both on ineffective assistance and they bore on prejudice. There was a one-line statement in the Washington Supreme Court decision that Mr. Brown didn't suffer prejudice, but the Washington Supreme Court didn't consider or didn't discuss the issue of prejudice at all. The Washington Supreme Court assumed that the decision not to cross-examine Dr. Brinkley was a tactical decision, without ever considering whether or not there had been any reasonable investigation of what Dr. Brinkley would have said. There was no discussion or consideration of what the cross-examination would have been because the Washington Supreme Court at the time denied my motion to take a deposition of Dr. Brinkley. The Washington Supreme Court never even considered or discussed Sally Schick at all, and while certainly she wasn't the star of the play, I think that she was an important source of corroboration, and there was no consideration of that, so it's our position that due to the failure to consider these important facts, it was an unreasonable application of Federal law. Just two more things. They knew months before the trial that they needed a psychiatrist because their own mitigation specialist, Mr. Schipp, told them that they needed a psychiatrist. And lastly, on the record. Kagan. Where is that? It's in the evidentiary hearing. It's in the district. It's testimony by Mr. Schipp in the district court evidentiary hearing. And lastly, on the lithium issue, trying to readdress your concern, Judge Berzon, the lithium and mental illness kind of got interrelated in this case, but lithium is also important as a stand-alone issue because it goes to the ability of the defendant to control his behavior and to conform his conduct to the requirements of the law, which under Washington statute is a statutory mitigator. Thank you. Okay.  Thank you. We'll adjourn.
judges: Kozinski, Reinhardt, Berzon